## In re LAUGHARN.

## CHANDLER v. LAUGHARN.

Circuit Court of Appeals, Ninth Circuit.
February 20, 1928.

No. 5299.

Bankruptcy ⊕⇒303(5)—Evidence held not to sustain decree that realty title to which was taken in name of bankrupt's wife, was conveyed to defraud bankrupt's creditors (Civ. Code Cal. §§ 164, 168).

Evidence *held* not to support a decree finding that real property purchased in the name of bankrupt's wife was paid for with his money, and that title was so taken to defraud his creditors, especially in view of the provision of Civ. Code Cal. §§ 164, 168, as then in force, that property conveyed to a married woman shall be presumed to be her separate property.

Appeal from the District Court of the United States for the Southern Division of the Southern District of California; William P. James, Judge.

Suit in equity by Hubert F. Laugharn, trustee in bankruptcy of Dan Chandler, against Celia Chandler. Decree for complainant, and defendant appeals. Reversed.

Law & Overholt, of Los Angeles, Cal., for appellant.

Sebald L. Cheroske, of Los Angeles, Cal. (Paul A. Tschirgi, of Los Angeles, Cal., of counsel), for appellee.

Before GILBERT, RUDKIN, and DIETRICH, Circuit Judges.

GILBERT, Circuit Judge. The complaint in the court below alleged that Dan Chandler was adjudged a bankrupt on September 10, 1925; that while insolvent, in 1922, with intent to defraud his creditors, he caused to be transferred to his wife, the appellant herein, certain described real estate and an automobile, which property was bought by him out of his separate funds; that the appellant knew that the property was placed in her name for the purpose of hindering, delaying, and defrauding his creditors; that ever since his marriage in 1921, with intent to defraud creditors, he has deposited all moneys earned and received by him in her name, but subject to his control and disposition. The answer denied the material allegations of the complaint and alleged that all of said property was bought by the appellant with money earned and owned by her. The trial court, upon the issues and the evidence, reached the conclusion that the property was the community property of Dan Chandler and his wife, and that, being desirous of avoiding payment of a particular debt, he had arranged to have it

appear that the property was his wife's sole property.

The persons whose activities and interests are involved in the controversy constitute a curious trio, consisting of one McGrath, a quack doctor, Dan Chandler, by occupation a medicine peddler and gambler, and the appellant, a Russian woman, uneducated, unable to read or write, and the mother of four children. Certain facts may be accepted as undisputed. The appellant was in 1913, and until 1920, the wife of one Margolas, but was separated from him, and was working for the support of herself and her children. This she did by peddling chewing gum. According to the witness who sold her the gum, she accumulated a considerable sum of money, of which at one time she intrusted to his keeping the sum of $700, but he did not know how much she had in addition. He urged her to put her money in a bank, but she declined, for fear that her husband might take it away from her. In 1916 or 1917 she first met Dan Chandler, who was then working for Dr. McGrath, peddling the latter's medicines and dividing with him the proceeds of the sales. At that time the appellant entered into an arrangement with McGrath by which she placed in some vacant rooms, which were leased to him, her furniture, which was then in storage, and she undertook to look after said rooms, which he was to use in treating patients afflicted with men's diseases, and she was to receive one-half of what he made. Chandler continued to peddle McGrath's medicines.

At the time of entering into that arrangement the appellant testified that she had $3,000 in currency, which she carried upon her person, being distrustful of banks, and that she had worked 17 hours a day peddling chewing gum and had saved her money, in order to take care of her children, whom she was supporting in an orphans' home, and whom she aimed to have with her in a home of her own. A portion of the money, she testified, she had placed in a bank, and it was shown that in 1917 and 1918 she had $724 in the Commercial National Bank, and that before she bought the house and lot which are involved in the suit she had between $7,000 and $8,000. In November, 1920, she entered into negotiations for the purchase of the property. At that time the property was in a probate court, and it was not until April, 1922, that for a consideration of $7,250 a conveyance was made to her; but in November, 1920, she moved into the house and has lived there ever since. In January, 1921, she was married to Chand-

ler. Chandler testified that she had paid the taxes on the property, that he had not contributed one cent for the upkeep thereof, that he had no money when he married her, but, on the contrary, had borrowed $25 from her on that occasion, and that he had never put any money into her bank account. Weyse, the attorney for the estate, which was in probate, testified that the negotiations for the purchase of the property were had with Dan Chandler and Mrs. Chandler, but principally with the latter; that as a matter of fact, Mrs. Chandler would not allow Mr. Chandler to open his head, but "told him to shut up, that she was doing this"; and that she stated at the time that she was buying the property, and that she wanted to make certain improvements on it, and was very indignant that she could not make them at that time.

There is entire absence of evidence to sustain the allegation of the complaint that the property was bought with Chandler's money, and all the witnesses called by the appellee denied it. There is also absence of evidence to sustain the finding of the court below that it was bought with community money, save and except the circumstances that Chandler accompanied the appellant when she deposited the money in the bank, and obtained from her a power of attorney which authorized him to draw checks against the account, and the fact that the purchase money was paid shortly after the appellant's marriage to Chandler, and while they were husband and wife. The appellant, when called as the appellee's witness, testified that the money which she had placed in bank was the income which came from her own business, "because, when I married Chandler, he said he would not support my children. I told him I would not ask any money for the children; I can support my children alone, but he can't get a dollar from my money—my business. I will support my own children, and he will get nothing from my business." There was no evidence that Chandler at any time contributed money to the bank account, or money to the purchase of the property in question. He seems to have been to the appellant a liability, rather than an asset, for he testified that at one time he borrowed from her $1,500 when he was arrested, accused of "biting a fellow's ear off" in a poker game, and later borrowed $2,000 when arrested on another charge of crime.

The appellee relies upon certain testimony which Chandler gave in 1921, when examined on proceedings supplementary to execution in a case pending in the state su-

perior court, when, speaking of his business relation to McGrath, he testified that he had an interest in the profits and proceeds, of which he and McGrath and the appellant each received one-third. But we cannot see that the testimony so given at that time, even if admissible for impeachment of the appellee's own witness, tends in any way to impeach it, or to overcome the positive evidence that the property was purchased with the appellant's separate funds.

Nor has the prima facie presumption created by section 164 of the Civil Code of California, unamended as it was at the time of the conveyance to the appellant, been overcome. That section provided that, "whenever any property is conveyed to a married woman by an instrument in writing, the presumption is that the title is thereby vested in her as her separate property." The presumption has been recognized in numerous decisions, among which may be cited Alferitz v. Arrivillaga, 143 Cal. 646, 77 P. 657; Shaw v. Bernal, 163 Cal. 262, 124 P. 1012; In re Carlin, 19 Cal. App. 168, 124 P. 868. And even if some of the money which went toward the purchase of the property here involved were the appellant's earnings after her marriage to Chandler, the property could not be subjected to the payment of his debts. It is so provided in section 168 of the Civil Code, and so held in Street v. Bertolone, 193 Cal. 751, 226 P. 913.

The judgment is reversed.